UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
FRANK H. FINKEL, et al.,

                                   <u>MEMORANDUM AND ORDER</u>

             Plaintiffs,                 CV 05-4656

    -against-                    (Wexler, J.)

S.I. ASSOCIATES CO., INC. and
NASSAU READY MIX CORP.,

                   Defendants.
------------------------------------------------------------X


APPEARANCES:

      COHEN, WEISS AND SIMON, LLP.
      BY: JAMES R. GRISI, ESQ.
      Attorneys for Plaintiffs
      330 West 42nd Street
      New York, New York 10036-6976


      DANDENEAU & LOTT
      BY: GERALD V. DANDENEAU, ESQ.
      Attorneys for Defendant Quality King Distributors, Inc.
      One Suffolk Square, Suite 300
      1601 Veterans Memorial Highway
      Islandia, New York 11749-1543


      TRIVELLA, FORTE & SMITH, LLP
      BY: CHRISTOPHER A. SMITH, ESQ.
      1311 Mamaroneck Avenue Suite 170
      White Plains, New York 10605

WEXLER, District Judge:[1]

This is an action commenced pursuant to Sections 502 and 515 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132 and 1145. Plaintiffs bring the action in their capacities as Trustees and Fiduciaries of the Building Material Teamsters Local 282 ("Local 282") Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave Trust Funds (the "Funds"). Plaintiffs seek declaratory, injunctive and monetary relief in the form of unpaid contributions to the Funds, interest, liquidated damages, attorneys' fees and costs.

Named as Defendants are two corporate entities, S.I. Associates Co., Inc. ("SI") and Nassau Ready Mix Corporation ("NRM"). Plaintiffs allege various legal theories in support of the claim that Defendants constitute a single entity such that NRM should be held bound to the terms of a collective bargaining agreement executed by SI. Defendants argue that, with the exception of the fact that the Defendant companies are operated by brothers, they are, and have always been, separate entities involved in different types of work.

Although not named as a Defendant, Plaintiffs seek to impose liability on a corporation known as Carini Industries ("Carini"). Liability against this company is alleged on the ground that it is an alter ego and/or successor to named Defendant SI. Plaintiffs also seek to hold Salvatore Sciarrino, the principle of SI, and Frank Sciarrino, the principle of NRM, liable as individuals. Individually liability on the parts of both Salvatore and Frank Sciarrino is sought on the ground that these individuals knowingly defrauded Plaintiffs, enabling Plaintiffs to pierce the corporate veil.

---

[1] The Court acknowledges the assistance of a student intern, Matthew Stuart, of St. John's University School of Law, in the research accompanying the preparation of this Memorandum and Order.

WEXLER, District Judge:[1]

This is an action commenced pursuant to Sections 502 and 515 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132 and 1145. Plaintiffs bring the action in their capacities as Trustees and Fiduciaries of the Building Material Teamsters Local 282 ("Local 282") Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave Trust Funds (the "Funds"). Plaintiffs seek declaratory, injunctive and monetary relief in the form of unpaid contributions to the Funds, interest, liquidated damages, attorneys' fees and costs.

Named as Defendants are two corporate entities, S.I. Associates Co., Inc. ("SI") and Nassau Ready Mix Corporation ("NRM"). Plaintiffs allege various legal theories in support of the claim that Defendants constitute a single entity such that NRM should be held bound to the terms of a collective bargaining agreement executed by SI. Defendants argue that, with the exception of the fact that the Defendant companies are operated by brothers, they are, and have always been, separate entities involved in different types of work.

Although not named as a Defendant, Plaintiffs seek to impose liability on a corporation known as Carini Industries ("Carini"). Liability against this company is alleged on the ground that it is an alter ego and/or successor to named Defendant SI. Plaintiffs also seek to hold Salvatore Sciarrino, the principle of SI, and Frank Sciarrino, the principle of NRM, liable as individuals. Individually liability on the parts of both Salvatore and Frank Sciarrino is sought on the ground that these individuals knowingly defrauded Plaintiffs, enabling Plaintiffs to pierce the corporate veil.

---

[1]  The Court acknowledges the assistance of a student intern, Matthew Stuart, of St. John's University School of Law, in the research accompanying the preparation of the Memorandum and Order.

A bench trial was held on November 27, 2007, December 14, 2007, December 1, 2007, January 2, 2008, January 3, 2008, January 4, 2008, January 11, 2008 and January 25, 2008. The trial has been completed and the parties have submitted proposed findings of fact, conclusions of law and legal memoranda. The court has considered those submissions and this constitutes the Court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

I.    The Parties and Their Principles

   1.    Plaintiffs are trustees and fiduciaries of the Funds.

   2.    The Funds are "employee benefit plans" and "multiemployer plans" within the meaning of ERISA.

   3.    The Funds are jointly administered by a Board of Trustees comprised of both labor and management representatives, in accord with the provisions of the Labor Management Relations Act.

   4.    The Funds are maintained in accord with a Restated Agreement and Declaration of Trust (the "Trust") for the purposes of: (1) collecting and receiving benefit contributions from employers and, (2) providing benefits to employee participants.

   5.    Defendant S.I. Associates Co., Inc. ("SI") is a New York corporation.

   6.    Salvatore Sciarrino is the principle and sole shareholder of SI.

   7.    Defendant Nassau Ready Mix Corp. ("NRM") is a New York corporation.

   8.    Frank Sciarrino is the principle and sole shareholder of NRM.

   9.    Salvatore Sciarrino and Frank Sciarrino are brothers.

II.     Earlier Sciarrino Family Companies

A.      Sciarrino Trucking (1980's - 1992)

  10.   Sciarrino Trucking was a trucking company established in the early 1980's.

  11.   Sciarrino Trucking was engaged in trucking that included the transportation of
        excavation materials.

  12.   Frank Sciarrino was involved in the business operation of Sciarrino Trucking.

  13.   Salvatore Sciarrino was not involved in the business operation of Sciarrino
        Trucking.

B.      Sciarrino Industries (1992 - present)

  14.   Sciarrino Industries is a company that was formed on October 6, 1992.

  15.   The business address of Sciarrino Industries was 190 Green Street, Valley Stream,
        New York.

  16.   Sciarrino Industries was in the business of transporting construction, excavation,
        and demolition materials as well as broken concrete from job sites via dump
        trucks and trailers.

  17.   Drivers who worked for Sciarrino Trucking became employees of Sciarrino
        Industries. These drivers perceived the transition from Sciarrino Trucking to
        Sciarrino Industries as nothing more than a name change.

  18.   Sciarrino Industries continued the same operations and used the same trucks and
        drivers as Sciarrino Trucking.

  19.   Sciarrino Industries had the same type of clients and performed the same types of
        duties as Sciarrino Trucking, such as the transportation of excavation materials.

4

20.   When Sciarrino Industries was first formed, employees received instruction from Frank Sciarrino.

21.   At the time of the formation of Sciarrino Industries, Salvatore Sciarrino was twenty-two years old.

22.   Salvatore Sciarrino later took over the supervision of Sciarrino Industries from Frank Sciarrino.

23.   Even after Salvatore Sciarrino took over the supervision of Sciarrino Industries from Frank Sciarrino, there was evidence that Frank Sciarrino was occasionally involved in the business operation of Sciarrino Industries.

24.   Although Frank Sciarrino was somewhat involved in the business of Sciarrino Industries, Salvatore Sciarrino was, during the time period relevant to this lawsuit, the individual responsible for overseeing the daily operation of Sciarrino Industries.

25.   During the time period relevant to this lawsuit, drivers received assignments and were supervised by Salvatore Sciarrino.

26.   During the time period relevant to this lawsuit, paychecks were signed by Salvatore Sciarrino.

III.   The Incorporation of Defendant SI

27.   Defendant SI was incorporated on March 5, 1999.

28.   At the time of the formation of SI, Sciarrino Industries remained a viable ongoing corporate entity.

29.   At the time of the formation of SI, the business operations of Sciarrino Industries were divided between SI and Sciarrino Industries.

30. Sciarrino Industries became the corporate entity that held the trucks and equipment used by the business.

31. SI was the corporate entity formed to pay employees.

32. The addressed maintained by SI for service of process was 190 Green Street, Valley Stream, New York.

33. Salvatore Sciarrino was the listed registered agent for service of process on SI.

34. Salvatore Sciarrino was the sole shareholder and officer of both Sciarrino Industries and SI.

35. Salvatore Sciarrino was responsible for the daily operation of the business of SI.

36. Currently, SI is an inactive corporation.

IV. The Business of Defendant SI

37. SI operated the same type of business as had been previously operated by Sciarrino Industries and its predecessor, Sciarrino Trucking.

38. SI employed many of the same drivers and worked for the same type of customers as Sciarrino Industries and Sciarrino Trucking.

39. Drivers who previously worked for Sciarrino Industries became employees of SI.

40. With the exception of the fact that paychecks were issued by SI, and not Sciarrino Industries, SI drivers continued to perform the same functions, and were involved in the same business operations, as when they were employees of Sciarrino Industries.

41. SI worked with a small number of major construction company clients, including Perini Contracting, Yonkers Contracting, Schiavone Construction and DeFoe Contracting. SI worked on major highway projects for these clients, including the

Long Island Expressway, the Williamsburg Bridge, the Westside Highway and the Clearview Expressway.

42. The current address of SI is the home address of Salvatore Sciarrino in Wantagh, New York.

## V. Carini Industries

43. In 2005, after SI ceased its business operations, Salvatore Sciarrino formed a company known as Carini Industries, Inc. ("Carini").

44. Salvatore Sciarrino is the sole owner of Carini.

45. Salvatore Sciarrino is responsible for the daily operation of Carini.

46. Carini is located at Salvatore Sciarrino's home address in Wantagh, New York.

47. Carini owns two tractor-trailer trucks.

48. Carini's trucks were previously owned by SI.

49. Gerard Giordonello, a driver for SI, was subsequently employed as a driver for Carini. Giordonello testified that he operated the same vehicle and performed the same duties for Carini as for SI.

50. The same payroll company that prepared payroll checks for SI prepared payroll checks for Carini.

51. Currently, Carini is an inactive corporation.

## VI. NRM

52. NRM is a New York corporation that was formed on May 14, 2002.

53. NRM maintains businesses at two concrete recycling plants located at 47 Herbhill Road, Glen Cove, New York ("Herbhill Road") and One Sheridan Boulevard, Inwood, New York ("One Sheridan").

54. Frank Sciarrino is the sole owner and shareholder of NRM.

55. NRM is engaged in the business of manufacturing and delivering concrete products such as ready mix concrete.

56. The concrete manufacturing plants operated by NRM at Herbhill Road and One Sheridan receive deliveries of materials used in the manufacture of concrete.

57. NRM was never a party to a collective bargaining agreement with Local 282.

58. NRM employees are not unionized.

59. Materials used in the manufacture of concrete include sand, stone and crushed stone.

60. There is an overlap in the type of trucks that were used by SI and those used by NRM. In particular, dump trucks and trailers, used in the business of transporting excavation materials (the business of SI) are also used in the transport of materials used in the manufacture of concrete (the business of NRM). In the course of its business, NRM used both dump trucks and trailers and cement mixers.

61. Cement mixers do not perform the same tasks as dump trucks and trailers operated. Driving a cement mixer requires a different set of skills than driving a dump truck or dump trailer.

62. SI was not engaged in the business of manufacturing concrete and did not use cement mixers in its business.

63. Carini was not engaged in the business of manufacturing concrete and not use cement mixers in the operation of its business.

64. Salvatore Sciarrino has no responsibilities with respect to the business operations of NRM.

65. Salvatore Sciarrino is not an officer or director of NRM.

66. Salvatore Sciarrino does not share in the revenues or profits of NRM.

VII. A&S Leasing Corp.

67. A&S Leasing Corp. ("A&S") is the holding corporation for the vehicles used in the business of NRM.

68. A&S owns the trucks, tractor trailers and cement mixers used in the business of NRM.

69. A&S Leasing and NRM share the same address.

70. Frank Sciarrino is the sole owner of A&S.

71. Salvatore Sciarrino has no responsibilities with respect to the business operations of A&S.

72. Salvatore Sciarrino is not an officer or director of A&S.

73. Salvatore Sciarrino does not share in the revenues or profits of A&S.

VIII. Collective Bargaining Agreements

A. Agreements Between Sciarrino Trucking, Sciarrino Industries, SI and Local 282

74. Sciarrino Trucking, Sciarrino Industries, and SI entered into a series of collective bargaining agreements with Local 282. By virtue of signing these collective bargaining agreements, the employer signatory became a party to the Trust Agreements incorporated therein.

75. The first such collective bargaining agreement referred to at trial was the 1993-1996 New York City Heavy Construction and Excavation Contract entered into between Sciarrino Industries and Local 282 (the "1993 New York City CBA").

76. The 1993 New York City CBA was signed, on behalf of Sciarrino Industries, by Lisa Sciarrino, the wife of Frank Sciarrino.

77. At the time of execution of the 1993 New York City CBA, Frank Sciarrino was in charge of the operation of Sciarrino Industries and Salvatore Sciarrino had not yet taken over the business operations of that company.

78. In 1999, SI executed into the 1999-2002 New York City Heavy Construction and Excavation Contract with Local 282 (the "1999 New York City CBA")

79. The 1999 New York City CBA was executed, on behalf of SI, by Salvatore Sciarrino, who had taken over the business of Sciarrino Industries from Frank Sciarrino.

80. The month of October, 1999, was the last month that Sciarrino Industries made benefit payments to Local 282. Thereafter, payments for workers were made by SI.

81. The most recent collective bargaining agreement entered into between SI and Local 282 was the 2002-2005 Nassau-Suffolk Heavy Construction Memorandum of Agreement, covering the time period of July 1, 2002 through June 30, 2005 (the "2002-2005 CBA").

82. It is the terms of the 2002-2005 CBA, executed by SI, to which Plaintiffs seek to bind NRM.

83. The 2002-2005 CBA was executed, on behalf of SI, by Salvatore Sciarrino, who was in charge, at that time, of the business of Sciarrino Industries and SI.

84. The 2002-2005 CBA and related Trust Agreement obligated SI to make contributions to the Funds in amounts corresponding to the hours worked by SI

drivers engaged in employment covered by the 2002-2005 CBA ("covered work").

85.    Covered work is defined in the 2002-2005 CBA as the "[c]onstruction of Engineering Structures and Building Foundations, exclusive of the Erection of Building Superstructures . . . ."

86.    SI was obligated to submit detailed written reports stating the amount of hours worked by each driver, in the form of "remittance reports."

87.    Remittance reports contain the names of employees, their social security numbers, the number of hours worked in covered employment, and a calculation of the amount owed to the Funds.

88.    Employer contributions to the Funds are typically due to Local 282 days after the last day of the month reported. In the event that an employer fails to make required contributions, it is the practice of Local 282 to send a notice, from a collection attorney, instructing the employer to remit payment within ten days. If payment is not made within a ten day period, Local 282 will begin to charge the employer interest on the contributions due.

89.    The 2002-2005 CBA, expired on June 30, 2005. After the expiration of that collective bargaining agreement, SI continued to submit remittance reports to Local 282, but made no Fund contribution payments. These remittance reports contained an indication, by SI that the union was "on strike."

90.    Plaintiffs disagree with the claim that Local 282 drivers have been on strike since expiration of the 2002-2005 CBA.

91. Salvatore Sciarrino testified that while SI is not currently working on any construction projects, he still considers the negotiation of a new contract with Local 282 to be an open issue.

92. Since the expiration of the 2002-2005 CBA, and continuing to date, Local 282 and SI have not entered into a new collective bargaining agreement.

B. Collective Bargaining Applicable to Carini, A&S and NRM

93. Carini is signatory to an agreement with a union referred to at trial as Local 138.

94. Carini has no collective bargaining agreement with Local 282.

95. A&S Leasing has never been a signatory to a collective bargaining agreement with Local 282.

96. NRM has never been a signatory to a collective bargaining agreement with Local 282.

97. The work performed by NRM, a company engaged in the ready mix business is, among other things, the delivery of concrete in cement mixers.

98. The transport of materials in cement mixers is covered by a collective bargaining agreement that is different from the 2002-2005 CBA.

99. The collective bargaining agreement that covers the transport of materials in cement mixers is known as a "bulk cement agreement." Such work is performed by a different type of vehicle and is different from the covered work that falls within the meaning of the 2002-2005 CBA.

IX. Real Property at Issue

100. During trial reference was made to two parcels of real property and how their transfers relate to Plaintiffs' claims.

101. The first of these properties is located at 2 Rason Road, Inwood, New York ("Rason Road"), which was a parcel of property located at the South Island Recycling Plant ("South Island"). The second parcel of real property relevant to Plaintiffs' claims was One Sheridan, one of the recycling plants operated by NRM.

A. Rason Road

102. Rason Road is a property that was divided into three parcels of real estate, one of which was owned by SI.

103. The remaining two parcels of real estate located at Rason Road were owned by South Island.

104. South Island is owned by Angela Sciarrino, the mother of Salvatore and Frank Sciarrino.

105. South Island is a concrete recycling plant that is engaged in the business of recycling broken concrete and asphalt.

106. South Island is a public facility available, inter alia, to businesses engaged in the concrete recycling business.

107. During the time it was a viable business entity, SI had occasion to park some of its trucks at South Island.

108. On certain occasions, drivers for SI were directed to dump recycling materials at South Island.

109. Drivers for Carini were occasionally directed to South Island to dump recyclable materials.

B.    One Sheridan

110.    One Sheridan was purchased by Sciarrino Industries from an entity known as
        Midwest Oil and Gas, Inc., on January 29, 2004.

111.    The purchase price of One Sheridan was $2.34 million.

112.    SI trucks were occasionally parked at One Sheridan.

113.    A former SI driver, Kevin Hartery, testified that when employed as a driver for SI,
        he noted that at certain times, NRM trucks were also parked at One Sheridan.

X.    The Downsizing of the Business of SI

114.    Beginning in or around 2002-2003, SI began to downsize its business.

115.    Salvatore Sciarrino explained that the downsizing of SI was related to financial
        difficulties.  The court credits as credible, the testimony of Salvatore Sciarrino as
        to the financial difficulties of SI.

116.    The financial difficulties of SI were due, in part, to the fact that SI did not get paid,
        for a period of three years, for extensive work performed at Ground Zero after
        September 11, 2001.

117.    Also responsible for the financial difficulties of SI was the fact that many of its
        former large clients failed to receive bid awards on jobs that would have included
        work by SI.

118.    There was testimony indicating that amounts owed to Local 282 also contributed to
        the financial difficulties experienced by SI.  Contributions due to Local 282 from
        SI were the subject of a previous lawsuit.  That lawsuit, which ended in settlement,
        sought contributions due from SI to Local 282 for the time period of November
        2002 through August of 2003.

A. The Transfer of SI Trucks

119. The downsizing of the business of SI led to the sale of SI trucks.

120. The first step in this downsizing was the sale of the company's ten wheeler trucks. These trucks were sold to L.T. Associates. Thereafter, SI began to sell its other trucks.

121. Trucks formerly owned by SI were sold to dealerships and finance companies.

122. One entity that purchased certain of SI's trucks was Gabrielli Trucks ("Gabrielli"). The owner of Gabrielli was related to Salvatore Sciarrino's wife. Certain of those trucks were later purchased by A&S, the corporate entity that holds equipment used by NRM.

123. Documents before the court indicate that the sale of trucks to Gabrielli, and later to A&S, were sales made for consideration.

124. SI also sold some of its trucks to entities known as All Service Funding Corp., LeaseHampton Equipment Services Corp., R&J Express, Inc, El Camino Trucking Corp., and an individual named Michael D'Niro.

125. By 2005, SI owned only four trucks. This was a reduction from the thirty trucks owned by SI prior to 2002.

126. There was never a direct sale of SI trucks to NRM. Sal Sciarrino testified that he never sold any SI trucks to A&S.

127. The court credits testimony indicating that certain, but not all trucks, formerly owned by SI, were later being used by NRM.

128. There is no indication that the sale of any trucks by SI was made without consideration.

129. Two former employees of SI, Kevin Hartery and Gerard Giordonello, testified that former SI drivers were hauling construction materials, including road base, sand, gravel and broken concrete for NRM in trucks formerly owned by SI.

130. The court finds that SI trucks that were transferred to NRM were used by NRM to transfer materials to NRM's concrete manufacturing plant.

131. The court cannot find, as a matter of fact, the nature of the materials transported in NRM trucks formerly owned by SI. Nor can the court find precise facts as to the pick up or destinations of such trucks on any dates on which they were observed.

132. The court cannot find that the clients for which NRM performed hauling services were former SI clients.

B.   The Transfers of One Sheridan and Rason Road

133. On April 21, 2006, One Sheridan was sold to Inwood Dock, LLC. ("Inwood Dock").

134. Inwood Dock was formed as a corporate entity on January 24, 2006.

135. Frank Sciarrino is the owner of Inwood Dock.

136. The compensation received by Sciarrino Industries from Inwood Dock, pursuant to the sale of One Sheridan, was in the form of satisfaction of a mortgage loan taken out by Sciarrino Industries when it purchased One Sheridan. That mortgage loan was in the amount of $1.8 million.

137. In January of 2000, Sciarrino Industries purchased Rason Road for the sale price of $550,000. In 2003, Sciarrino Industries later refinanced Rason Road in the amount of $305,374.

138. In 2005, Sciarrino Industries sold its portion of Rason Road to South Island. Salvatore Sciarrino testified that the sale of Rason Road to South island was for a purchase price of approximately $500,000.

C. Former SI Drivers and Employees Who Later Worked for NRM

139. At the time of the downsizing of SI, SI drivers left the company.

140. Some, but not all of SI's drivers were told that they could work at NRM, but the job would not be a union job.

141. Of the drivers who worked for SI and later worked for NRM, three began work for NRM within one month of their departure from SI. The remaining SI drivers who later worked for NRM, began at the latter company between seven months and almost two years following their departures from SI, as set forth below.

142. After leaving his employment as a driver with SI in May of 2003, Michael Busch began to work for NRM in January of 2005.

143. After leaving his employment as a driver with SI in June of 2002, Joseph Kateridge, Jr. began to work for NRM in January of 2003.

144. After leaving his employment as a driver with SI in April of 2003, Joseph Kateridge Sr. began his employment with NRM in May of 2003.

145. After leaving his employment as a driver with SI in February of 2002, James Mammes began to work for NRM in July of 2003.

146. After leaving his employment as a driver with SI in April of 2003, David Saladino began to work for NRM in May of 2003.

147. After leaving his employment as a driver with SI in August of 2003, Lawrence Arcese began to work for NRM in August of 2004.

148. After leaving his employment as a driver with SI in April of 2003, Brian Tankiewicz began to work for NRM March of 2005.

149. Other drivers who left SI and later worked for NRM are Billy Scott, Walter Madden and Rick Jordanelli.

150. There was evidence that at one time, two SI employees, Tony Kaslanowski and Patrick Gonsalves, did occasional driving work for NRM while employed as drivers for SI.

151. There was evidence that SI drivers would infrequently make deliveries of sand and stone to NRM.

152. Such deliveries were made from a company known as New York Sand, a client of both SI and NRM.

153. Joel Mareno and Milton Cuarda, were two mechanics who were employed by SI and later became employees of NRM.

154. There was evidence that two drivers formerly employed at SI went to work for Carini. The jobs filled by these individuals were not union jobs.

155. Edward Kritesman was employed by Carini as a full time mechanic. Union fund payments were made on his behalf to Local 138.

XI. Testimony of Investigator Robert Machado

156. Robert Machado ("Machado") is employed as an investigator pursuant to an order of a court in the Eastern District of New York.

157. Machado investigates allegations of corruption in connection with the business of Local 282. Machado also investigates allegations of attempts to defraud union benefit funds of monies required to be paid by employers.

158. In connection with his investigations, Machado had the opportunity to investigate the relationship between SI and NRM.

159. Machado's investigation included the observation of trucks being used by NRM at Herbhill Road and at One Sheridan.

160. Machado's investigation revealed, among other things, the vehicle identification numbers ("VIN's") of trucks, tractors and trailers being used by NRM at Herbhill Road and One Sheridan.

161. While license plate numbers for vehicles change when ownership changes, VIN's remain the same. Thus, knowledge of the VIN allows one to identify all prior registrants of vehicles.

162. By checking VIN's of vehicles in a database maintained by the New York State Department of Motor Vehicles ("DMV"), Machado was able to testify as to the prior owners of the vehicles observed.

163. Machado has over thirty years of experience using the DMV database to trace ownership of vehicles through VIN's.

164. The court finds Machado's testimony, based upon his observation of VIN's and his consultation with the DMV database, to be credible to establish a reliable chain of ownership for the vehicles about which he testified.

165. Machado identified the VIN's of vehicles and testified as to the prior owners of certain particular trucks, tractors and trailers being used by NRM.

166. The trucks identified by Machado had the letters "NRM" painted on the doors.

167. Based upon the testimony of Machado, which the court finds to be credible, the court finds that ten trucks, trailers and/or tractors (referred to herein collectively as

"trucks") observed by Machado, were formerly owned by SI and were later transferred to A&S, the company that leases vehicles used by NRM.

168.    Machado's testimony supports the court's finding that certain trucks formerly owned by SI were ultimately transferred to A&S, and were being used in the business of NRM.

169.    Machado testified that, in addition to the concrete manufacturing business, NRM is engaged in the same business that was formerly the business of SI. Specifically, Machado testified that NRM is engaged in the transport of excavation materials from job sites.

170.    Machado testified that he observed trucks, formerly owned by SI, being used to taking excavated materials out of job sites, delivering rock, sand and dirt to different sites.

171.    Machado's testimony, regarding his position that the same type of work was being performed by the trucks operated by NRM as was previously performed by SI, was based upon a single observation made in 2004. Specifically, Machado observed work being performed at a job site located on Cantiague Road in Westbury, New York ( "Cantiague Road").

172.    Machado testified that he personally observed NRM trucks at Cantiague Road removing concrete excavated material to be recycled.

173.    Machado testified that Cantiague Road was not a union job.

174.    It was Machado's position that the type of material being transported by a dump trailer does not dictate the conclusion as to whether the driver is performing

covered work. Machado took the position that covered work, within the meaning of the 2002-2005 CBA, takes place when a union driver hauls any type of material.

175. Machado conceded, however, that the transport of materials used in the manufacture of cement, such as materials transported in a cement mixer is covered by a collective bargaining agreement known as a bulk cement collective bargaining contract, a collective bargaining agreement that is different from the 2002-2005 CBA.

176. While Machado testified that he observed drivers formerly employed by SI working for NRM, he had no knowledge of employees working for both companies at the same time.

177. Machado conceded that the material he observed being hauled in connection with the Cantiague Road site could have been broken concrete material used by NRM in the recycling and manufacture of concrete.

### CONCLUSIONS OF LAW

178. This court has jurisdiction over this action pursuant to ERISA. 29 U.S.C. § 1132(a)(3),(c) and (f) and 29 U.S.C. § 1145.

179. Venue lies in this district pursuant to ERISA, 29 U.S.C. § 1132(e)(2), as the Funds are administered in this district.

I. Plaintiffs' Theories

Plaintiffs allege that NRM should be held bound to the union obligations of SI based upon the theories that SI and NRM constitute a "single employer," and/or that the companies are alter egos of each other and/or that the companies constitute a "double breasted" operation. The determination as to each of these issues turns on the court's findings of fact. Lihli Fashions Corp.,

Inc. v. NLRB, 80 F.3d 743, 745 (2d Cir. 1996). Plaintiffs also seek to hold Salvatore and Frank Sciarrino individually liable on the theory that these individuals engaged in fraud sufficient to pierce the corporate veil. Finally, although not named as a Defendant herein, Plaintiffs seek to hold Carini liable for unpaid Fund contributions. The court discusses below the legal standards and its holdings with respect to each theory.

A.    Single Employer

180.  A collective bargaining agreement may be enforced against a non-signatory employer if: (1) the signatory employer and the non-signatory employer constitute a "single employer," and, (2) the employees of the companies constitute a single appropriate bargaining unit. Lihli Fashions Corp., Inc. v. NLRB, 80 F.3d 743, 747 (2d Cir. 1996); see also Brown v. Sandimo Materials, 250 F.3d 120, 129 (2d Cir. 2001); King v. Unique Rigging Corp., 2005 WL 2290585 *2 (E.D.N.Y. 2005).

181.  Courts generally look to four factors in determining whether the single employer doctrine applies. These factors are: "[1] interrelation of operations; [2] common management; [3] centralized control of labor functions; and [4] common ownership. South Prairie Constr. v. Local No. 627, 425 U.S. 800, 96 S.Ct. 1842 (1976) (per curiam) (establishing four-factor test for determining single employer status); Lihli Fashions, 80 F.3d at 747. None of these factors are controlling, and not all must be present. Id., LaBarbera v. Les Sub-Surface Plumbing, Inc., 2008 WL 906695 *4 (E.D.N.Y. 2008).

182.  A finding of single employer status "depends on all circumstances of the case and is characterized by absence of an 'arm's length relationship found among unintegrated companies.'" Lihli Fashions, 80 F.3d at 747, quoting, NLRB v. Al

Bryant, Inc., 711 F.3d 543, 551 (3d Cir. 1983); Les Sub-Surface Plumbing, 2008 WL 906695 *4 (E.D.N.Y. 2008).

183.    Family connections and the common use of facilities and equipment are also relevant to the determination of single employer status. Lihli Fashions, 80 F.3d at 747.

184.    To illustrate, single employer status was easily established in King v. Unique Rigging, 2005 WL 2290585 (E.D.N.Y. 2005), and LaBarbera v. C. Volante Corp., 164 F. Supp.2d 321, 324-25 (E.D.N.Y. 2001).

185.    In Unique Rigging, it was undisputed that: (1) a single individual was the chief officer and shareholder of both companies sought to be held liable; (2) the companies shared a single fleet of trucks; (3) employees performed the same duties and, (4) the companies shared a single address and telephone number.  Unique Rigging, 2005 WL 2290585 * 2.

186.    Similarly, in C. Volante Corp., the companies at issue shared the same employees and customers.  There was also intermingling of funds and co-management of the businesses by family members who dealt with third parties on behalf of any of the companies at any given time.  C. Volante, 164 F. Supp.2d at 324-25, see also LaBarbera v. Cretty Enters., Inc., 2007 WL 4232765 *5 (E.D.N.Y. 2007)(single employer found where companies were engaged in the same business, had common management and ownership, shared office space, office support employees, and exchanged drivers).

187.    In addition to showing that defendant employers constitute a single employer, a plaintiff alleging single employer status must also prove that the group of

23

employees for whose benefit union contributions are sought, constitute a "single bargaining unit." Lihli Fashions, 80 F.3d at 747; see also Cretty, 2007 WL 4232765 *5.

188.   When making this determination, courts look for a "community of interests" among the relevant employees. South Prairie Construction Co. V. Local No. 627, 425 U.S. 800, 804-05 (1976); Lihli Fashions, 80 F.3d at 747; Local One v. Stearns & Beale, Inc., 812 F.2d 763, 769 (2d Cir. 1987); Cretty, 2007 WL 4232765 *6; C. Volante, 164 F. Supp.2d at 326.

189.   The "community of interests" assessment includes consideration of whether employees share similar working conditions, job classifications and functions. Bourgal v. Robco Contracting Enters., Ltd. 969 F. Supp. 854, 863 (E.D.N.Y. 1997), aff'd., 182 F.2d 898 (2d Cir. 1999); Unique Rigging, 2005 WL 2290585 *3 (E.D.N.Y. 2005); Mason Tenders District Council Welfare Fund v. Itri Brick and Concrete Corp., 1997 WL 678164 *13 (S.D.N.Y. Oct. 13, 1997).

190.   Relevant factors include geographic proximity, similarity of skills and function, similarity of employment conditions, centralization of administration, managerial and supervisory control, employee interchange, functional integration of the employer and bargaining history.  C. Volante, 164 F. Supp.2d at 326.

B.   Alter-Ego Doctrine

191.   The alter-ego doctrine is conceptually unique from the single employer doctrine. Goodman Piping Products v. N.L.R.B., 741 F.2d 10, 11 (2d Cir. 1984); Cretty, 2007 WL 4232765 *7.  The focus of this doctrine "is on the existence of a disguised continuance or an [employer's] attempt to avoid the obligations of a

collective bargaining agreement through a sham transaction or technical change in operations." Lihli Fashions Corp., 80 F.3d at 748; Les Sub-Surface Plumbing, 2008 WL 906695 *3; Cretty, 2007 WL 4232765 *7; see also Newspaper Guild of N.Y., Local No. 3 v. N.L.R.B., 261 F.3d 291 (2d Cir. 2001).

192. "An employer found to be the alter-ego of another is automatically responsible for the other's legal and contractual obligations under the labor laws." Newspaper Guild, 261 F.2d at 299 (citing Lihli Fashions, 80 F.3d at 748). The hallmarks of the alter-ego doctrine include "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." Newspaper Guild of N.Y., 261 F.3d at 299 (citing Goodman Piping, 741 F.2d at 11); Les Sub-Surface Plumbing, 2008 WL 906695 *3; see also Local One Amalgamated Lithographers of America v. Stearns & Beale, 812 F.2d 763,772 (2d Cir.1987).

193. Anti-union animus may be "germane" to a finding of alter ego status, but is not necessary to such a finding. Goodman Piping, 741 F.2d at 12.

C. Double-Breasted Operation

194. A double-breasted operation is one in which two entities are created side-by-side, one union and one non-union, within the same region. Sandimo, 250 F.3d at 123. Under a double-breasted operation, the union entity bids on union contracts, and the non-union entity bids on non-union contracts. Local One Amalgamated Lithographers of America v. Stearns & Beale, Inc., 812 F.2d 768, 770-771 (2d Cir. 1987).

## II. Analysis

195. The court's consideration of the facts as set forth above, in the context of the Plaintiffs' burden of proof, leads to the conclusion that Plaintiffs have not met their burden of proof as to the existence of any of the theories alleged in support of the claim that NRM should be held liable for the union obligations of SI.

196. The court holds that SI and NRM did not constitute a single employer so as to render NRM liable for SI's union fund contributions.

197. Specifically, the court holds that Plaintiffs have failed to show that SI and NRM had interrelated operations, common management, centralized control of labor functions or common ownership.

198. The businesses of SI and NRM are essentially different types of work for different clients. While SI was engaged in the business of hauling excavation materials, NRM is engaged in the concrete manufacturing business. To be sure, both businesses involved, at times, the use of dump trucks and trailers to haul materials. Plaintiffs however, failed to proved that the hauling of materials by NRM was anything more than incidental to the concrete manufacturing business of NRM. Plaintiffs have not come forward with evidence sufficient for the court to make the factual leap that this hauling was somehow a disguised continuation of the failed business of SI.

199. Although Salvatore and Frank Sciarrino are brothers, they did not share common ownership of their businesses, which were kept separate in corporate form and substance. Salvatore Sciarrino was, during the relevant time period, the manager of SI while Frank Sciarrino managed NRM.

200. Employees of SI and NRM were separately hired and paid. The mere fact that there was limited testimony that Frank was occasionally consulted on the business of SI was insufficient to sustain Plaintiff's burden of proving common ownership and management of the Defendant corporations.

201. In light of the fact that single employer status has not been held to exist, the court need not consider the issue of whether SI and NRM employees constitute an appropriate bargaining unit.

202. In connection with this issue, the court notes that it makes no finding as to whether or not the nature of material being hauled in a truck is determinative of the issue of whether the driver of that truck is performing work covered by a particular collective bargaining agreement. Any such determination is unnecessary in the context of these proceedings where it is clear that Plaintiffs have not met their burden of proof as to single employer status.

203. As to alter ego, the court holds that Plaintiff has not proven the existence of sham transactions to disguise the actual continuation of the business of SI by NRM.

204. Transfers of SI properties located a Rason Road and One Sheridan were shown to have been for consideration. While SI may have realized a loss on these sales, the assumption of a $1.3 million mortgage by Inwood Dock on the One Sheridan transaction and payment in connection with the Rason Road sale show ample consideration paid for those properties.

205. Similarly, the transfer of SI trucks, most of which were sold to separate companies and some of which were ultimately purchased by A&S, were proven to have been made for consideration and cannot support a finding of a sham transaction.

206. Nor has Plaintiff proven the "hallmarks," of the alter-ego doctrine, i.e., "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership. Facts found with respect to the allegation of single employer status, support this holding as well.

207. While Plaintiff has shown the existence of a degree of anti-union animus on the part of Salvatore Sciarrino, that finding, standing alone, is not sufficient to hold that alter-ego status has been proven.

208. Nor can the court find that Plaintiffs have sustained their burden of proving that SI and NRM operated a double-breasted operation. To prevail on this theory, Plaintiffs were required to show that SI and NRM existed side by side and that SI bid on union contracts while NRM handled non-union bids. No such relationship is supported by any facts proven at trial.

III. Claims Not Raised in Complaint

209. In addition to seeking to hold NRM liable for the union obligations of SI, Plaintiffs seek: (1) to hold Salvatore and Frank Sciarrino liable as individuals and, (2) to hold Carini liable as a successor and/or alter ego of SI. Neither of these claims were set forth in Plaintiffs' complaint. Instead, Plaintiffs seek to amend the pleadings after trial so as to make the evidence conform to the pleadings. See Fed. R. Civ. P. 15(b). While the court allowed the introduction of evidence in support of such claims at trial, decision was reserved as to whether amendment of the pleadings was appropriate.

210. The court's holding that NRM constitutes neither a single employer, alter ego, or double-breasted operation with SI, makes it unnecessary to consider the issue of

28

individual liability in connection with such claims against Salvatore and Frank Sciarrino.

211. As to the claim against Carini, the court holds that it would be manifestly unfair to allow Plaintiffs to proceed against this entity at this time.

212. Plaintiffs knew of the existence of Carini as a corporate entity long before trial. Had Plaintiffs wished to proceed against Carini, they could have moved to amend the complaint well in advance of trial. Such a timely amendment would have facilitated the taking of fair discovery and preparation for trial.

213. Having failed to amend the complaint to add the claim against this entity in a timely manner, the court declines to exercise its jurisdiction to allow Plaintiffs to join this separate corporation as a defendant. See Grand Light & Supply Co., Inc. v. Honeywell, Inc., Micro Switch, 771 F.2d 672, 680 (2d Cir. 1985) (amendment after trial can result in prejudice "where it is not clear that the opposing party had the opportunity to defend against the new claim and where that party might have offered additional evidence had it known of the claim").

## CONCLUSION

For the foregoing reasons, Plaintiffs claims against Defendants are dismissed.

The Clerk of the Court is directed to terminate all outstanding motions and to close the file in this case.

SO ORDERED.

LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
June 25, 2008